**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

MARCUS SIMMONS,

      Petitioner,                          Civil No. 2:16-CV-10554
                                        HONORABLE NANCY G. EDMUNDS
v.                                        UNITED STATES DISTRICT JUDGE

JEFFREY WOODS,

      Respondent,
_____/

## OPINION AND ORDER DENYING THE PETITION FOR WRIT OF HABEAS CORPUS AND DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY OR LEAVE TO APPEAL *IN FORMA PAUPERIS*

      Marcus Simmons, ("Petitioner"), confined at the Chippewa Correctional Facility in Kincheloe, Michigan, filed a *pro se* petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, in which he challenges his conviction for first-degree premeditated murder, M.C.L.A. 750.316; assault with intent to commit murder, M.C.L.A. 750.83; assault with intent to do great bodily harm, M.C.L.A. 750.84; possession of a firearm by a felon, M.C.L.A. 750.224f; and possession of a firearm in the commission of a felony, M.C.L.A. 750.227b. For the reasons that follow, the petition for writ of habeas corpus is **DENIED**.

### I. Background

      Petitioner was convicted following a jury trial in the Wayne County Circuit Court. This Court recites verbatim the relevant facts relied upon by the Michigan Court of Appeals, which are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1). *See Wagner v. Smith,* 581 F.3d 410, 413 (6th Cir. 2009):

      This appeal arises from a shooting on April 19, 2013, in Detroit, Michigan,

which resulted in the death of one of the victims, Donte Mack.  On April 19, 2012, at approximately 4 or 5:00 p.m., Faris Matti was working at the K & G Market on East Warren.  According to Matti, defendant came into the K & G Market every day, when defendant came in on April 19, 2013, Matti noted that defendant was wearing a jacket with a picture of President Obama's face stitched into the back.  At approximately 8:45 p.m., Kila Parks drove herself, Donte Mack, and their one-year-old daughter Dariyah Mack, to the K & G Market in Parks' Saturn.  When they arrived at the K & G Market, Donte went straight inside and Parks noticed defendant standing against the K & G Market approximately 9 to 12 feet from where she was sitting in her car.  At some point, Parks noticed that defendant entered the K & G Market through the side wearing a black "hoodie" sweatshirt.  Inside the store, defendant purchased chips, threw money at Matti, and left the store.

Parks saw that Donte had come out of the K & G Market, so she unlocked her doors, when he got inside the car he locked the doors.   Parks saw defendant walking behind Donte, and as soon as Donte locked the doors, she heard gunshots.  Parks saw the bottom of defendant's pants and "hoodie" sweatshirt through the passenger side window of the car.  Parks heard a total of 10 or 11 gunshots, which sounded like they came from the same gun and lasted for approximately 10 seconds.  Matti also heard gunshots approximately 30 or 40 seconds after defendant left the store.  Matti testified that he looked up and saw the shooting through the K & G Market's security camera.

After the shooting stopped, Parks saw defendant run, she then got out of the car and began to scream.   Donte told her to grab Dariyah, he fell and sat down outside of the store, Parks took Dariyah into the K & G Market.  During the shooting, Parks was shot twice in the leg, twice in the arm, once in the bladder, once in the kidney, and once in the liver.  Dariyah was not injured.

Detroit Police Officer Michael Angeleri arrived at the scene and saw a car with the passenger side window shot or broken out.  He also saw Donte lying face down at the entrance of the K & G Market.   Donte and Parks were transported to the hospital by ambulance, but Donte was dead on arrival.  Parks had surgery on her arm and bladder.  After the incident, Parks was shown a photographic lineup and identified defendant as the shooter.

Detroit Police Officer Lance Sullivan arrived at the scene of the incident at approximately 11:00 p.m., and obtained surveillance videotape footage from the K & G Market.  Several "screen shot" images of the videotape footage were admitted at trial.  One image showed Donte at the counter of the K & G Market, while another image showed a person in dark clothing, a dark "hooded" jacket, and white shoes entering the K & G Market.  The next image showed the person at the store counter, then the next images showed Donte

walking toward the door of the K & G Market and exiting. The person in dark clothing then exited the store. Other images presented at trial showed a person wearing a "dark hood" standing at the passenger side door of a car extending his arm toward the door, an image showing a person with his right arm pointing and an image of a shadow on the sidewalk, and a "long item" appeared near the head of the person in the shadow. Additionally, the surveillance videotape recordings were also played at trial, and Officer Sullivan described what they depicted. One videotape recording showed an individual walk to a car parked at the K & G Market, and another individual approached the car. Two additional videotape recordings showed Donte leave the K & G Market, the man in the "hooded" sweatshirt leave, and a young woman come into the store with a young child shortly thereafter. Relative to the surveillance evidence, Matti informed the police that the video recording revealed that defendant was the person who started shooting.

Matti testified that on April 20, 2013, defendant came into the K & G Market. Matti telephoned the police, who searched the area and found defendant with a woman, DeAngela Kelly. Defendant was wearing a jacket with President Obama's picture on the back, he was immediately arrested and while conducting a search of his jacket, Detroit Police Officer Jarmiare McEntire, recovered 26 packages of marijuana.

DeAngela Kelly testified as defendant's alibi witness at trial, stating that she lived at 15736 Munich at the time of the incident, was a friend of defendant and her sister was defendant's girlfriend. Kelly further testified that defendant came to Kelly's house on April 19, 2013, at approximately 6 or 7:00 p.m., wearing a red shirt, blue jeans, and a coat. According to Kelly, defendant fell asleep on the floor of her bedroom, so she and her son went into another room to watch television. Kelly's sister arrived at her house at approximately 8:00 p.m., and she stayed at the house until sometime between 8:30 and 9:00 p.m. Kelly said defendant was at her house until she fell asleep at approximately 9:15 or 9:30 p.m., when she woke up around 1 or 2:00 a.m., defendant was no longer in her house. Defendant testified on his own behalf at trial, explaining that he and Donte were friends and there was no ill will between them. According to defendant, he went to the K & G Market at approximately 3:30 p.m. on April 19, 2013. He admitted that he was wearing the jacket with President Obama's face on it and further testified that he encountered Donte at the K & G Market, and Donte had given defendant advice because someone had tried to rob him earlier in the day. Defendant testified that he left the K & G Market at approximately 4:30 or 5:00 p.m and went to Kelly's house approximately one hour later, wearing a red T-shirt and blue "Mack" jeans, he said that he left his black "hoodie" sweatshirt and coat downstairs. Defendant testified that he left Kelly's house at approximately 9:15 or 9:30 p.m. because he had heard that there had been a shooting, so he went to the K & G Market where he said he stayed for 5 or 10 minutes.

3

At approximately 9:40 p.m., defendant said he left the scene of the incident and partied with a woman named Ashley for the rest of the night.

Defendant testified that he sold medical marijuana, but he did not have a prescription to sell medical marijuana. Defendant also admitted to selling drugs on occasion while he was at the K & G Market, but that he never intended to sell the 26 bags of marijuana that were found in his coat when he was arrested. He also admitted at trial, that during a telephone conversation in jail, he said that Donte was the man he "wacked out." However, according to defendant's testimony, he meant to say: "Is that the one they said that I shot?"

The jury convicted defendant as outlined above. Defendant was then sentenced by the trial court as previously stated. This appeal then ensued.

*People v. Simmons*, No. 318564, 2015 WL 302751, at *1–3 (Mich. Ct. App. Jan. 22, 2015).

Petitioner's conviction was affirmed on appeal. *Id., lv. Den.* 498 Mich. 884 (2015).

Petitioner seeks a writ of habeas corpus on the following grounds: (1) petitioner was denied a fair trial because of judicial misconduct, (2) petitioner was denied a fair trial because of prosecutorial misconduct, and (3) petitioner was denied the effective assistance of trial counsel. [1]

## II. Standard of Review

28 U.S.C. § 2254(d), as amended by The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), imposes the following standard of review for habeas cases:

---

[1] Respondent argues that the habeas petition should be dismissed because petitioner failed to sign it. Although a district court may refuse to file, or may even dismiss, an unsigned and unverified petition for writ of habeas corpus, the defect is one that district court may, if it sees fit, disregard. *See Hendricks v. Vasquez*, 908 F.2d 490, 491 (9th Cir. 1990). The Court declines to dismiss the petition on this basis. Respondent further contends that petitioner's first and second claims are procedurally defaulted, because he failed to object to the errors at trial and the Michigan Court of Appeals relied on this failure to object as a basis of rejecting the claims. Petitioner claims that his trial counsel was ineffective for failing to object to the judicial and prosecutorial misconduct. Ineffective assistance of counsel may establish cause for procedural default. *Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000). Given that the cause and prejudice inquiry for the procedural default issue merges with an analysis of the merits of petitioner's defaulted claims, it would simply be easier to consider the merits of these claims. *See Cameron v. Birkett*, 348 F. Supp. 2d 825, 836 (E.D. Mich. 2004).

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409.  A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 410-11.  "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011)(citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  Therefore, in order to obtain habeas relief in federal court, a state prisoner is required to show that the state court's rejection of his or her claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington,* 562 U.S. at 103.  A habeas petitioner should be denied relief

5

as long as it is within the "realm of possibility" that fairminded jurists could find the state court decision to be reasonable. *See Woods v. Etherton,* 136 S. Ct. 1149, 1152 (2016).

The Court notes that the Michigan Court of Appeals reviewed and rejected petitioner's first and second claims under a plain error standard because petitioner failed to preserve the issues by objecting at the trial court level. *People v. Simmons*, 2015 WL 302751, at * 3, 8.

In *Fleming v. Metrish,* 556 F.3d 520, 532 (6th Cir. 2009), a panel of the Sixth Circuit held that the AEDPA deference applies to any underlying plain-error analysis of a procedurally defaulted claim. In a subsequent decision, the Sixth Circuit held that that plain-error review is not equivalent to adjudication on the merits, so as to trigger AEDPA deference. *See Frazier v. Jenkins*, 770 F. 3d 485, 496 n. 5 (6th Cir. 2014). The Sixth Circuit noted that "the approaches of *Fleming* and *Frazier* are in direct conflict." *Trimble v. Bobby*, 804 F.3d 767, 777 (6th Cir. 2015). When confronted by conflicting holdings of the Sixth Circuit, this Court must follow the earlier panel's holding until it is overruled by the United States Supreme Court or by the Sixth Circuit sitting *en banc*. See *Darrah v. City of Oak Park,* 255 F.3d 301, 310 (6th Cir. 2001). This Court believes that the AEDPA's deferential standard of review applies to petitioner's first and second claims, even though they were reviewed only for plain error.

### III. Discussion

### A. Claim # 1. The judicial bias/misconduct claim.

Petitioner first claims that he was denied a fair trial because of judicial bias or misconduct.

6

The Due Process Clause of the Fourteenth Amendment requires a fair trial in a fair tribunal before a judge with no actual bias against the defendant or an interest in the outcome of the case. *See Bracy v. Gramley*, 520 U.S. 899, 904-05 (1997).  The right to an impartial judge is a right whose deprivation a state prisoner may complain of in a federal habeas corpus proceeding. *Tyson v. Trigg*, 50 F.3d 436, 438 (7th Cir. 1995)(citing to *Turner v. Ohio*, 273 U.S. 510, 523 (1927); *In Re Murchison*, 349 U.S. 133 (1955)).  Trial judges have a wide latitude in conducting trials, but they must preserve an attitude of impartiality and scrupulously avoid giving the jury the impression that the judge believes that the defendant is guilty. *Harrington v. State of Iowa*, 109 F.3d 1275, 1280 (8th Cir. 1997); *Brown v. Palmer,* 358 F. Supp. 2d 648, 657 (E.D. Mich. 2005).

However, in reviewing an allegation of judicial misconduct in a habeas corpus petition, a federal court must ask itself whether the state trial judge's behavior rendered the trial so fundamentally unfair as to violate federal due process. *Duckett v. Godinez*, 67 F.3d 734, 740 (9th Cir. 1995); *Brown v. Palmer,* 358 F. Supp. 2d at 657.  To sustain an allegation of bias by a state trial judge as a grounds for habeas relief, a habeas petitioner must factually demonstrate that during the trial the judge assumed an attitude which went further than an expression of his or her personal opinion and impressed the jury as being more than an impartial observer. *Brinlee v. Crisp*, 608 F.2d 839, 852-53 (10th Cir. 1979); *Brown,* 358 F. Supp. 2d at 657.  A trial judge's intervention in the conduct of a criminal trial would have to reach a significant extent and be adverse to the defendant to a significant degree before habeas relief could be granted. *McBee v. Grant*, 763 F.2d 811, 818 (6th Cir. 1985); *Brown,* 358 F. Supp. 2d at 657.  The Supreme Court has ruled that "expressions of impatience, dissatisfaction, annoyance, and even anger" do not establish judicial bias

or misconduct. *Liteky v. United States*, 510 U.S. 540, 555-56 (1994).  "A judge's ordinary

efforts at courtroom administration-even a stern and short-tempered judge's ordinary

efforts at courtroom administration-remain immune." *Id.*

Petitioner first claims that the trial judge improperly questioned Ms. Parks with the

following questions:

THE COURT: Ms. Parks, you drove the car, right?

THE WITNESS: Yes.

THE COURT: All right. And Mr. Mack was in the passenger seat of the front seat?

THE WITNESS: Yes.

THE COURT: And do you remember where you parked the car when you pulled up in front of K & G Party Store?

THE WITNESS: Yes, I do.

THE COURT: If I gave you a little piece of paper, could you draw in for us where the car was?

THE WITNESS: If I could.

THE COURT: Okay. You see it says K & G Party Store.

THE WITNESS: Yes, and the sidewalk.

THE COURT: And the sidewalk. Okay. Draw in for us where you parked your car. Can you 10 put an X where you first saw this person that 11 ultimately wound up shooting? Put an X where he was standing. Okay. Now put an S, the letter S, where he was when the shooting started. When this shooting took place, did the person who was doing the shooting say anything?

THE WITNESS: No.

THE COURT: When the shooting took place, Mr. Mack was already in the car?

THE WITNESS: Yes.

8

THE COURT: In the front seat, passenger side?

THE WITNESS: Yes.

THE COURT: You had never gotten out of 24 the car by that time, had you?

THE WITNESS: No.

THE COURT: And your daughter was in the center of the back seat?

THE WITNESS: Yes.

THE COURT: So Mr. Mack was in between the shooter and your daughter?

THE WITNESS: Excuse me?

THE COURT: In the car there was a shooter that was outside; is that right?

THE WITNESS: Yes.

THE COURT: Mr. Mack was seated in the front seat on the passenger side, right?

THE WITNESS: Yes.

THE COURT: And your daughter was in the back seat, correct?

THE WITNESS: Yes.

THE COURT: So who was between the shooter and your daughter?

THE WITNESS: Mr. Mack, my child's father.

THE COURT: Right. Was there any particular reason why you were going to this K & G Party Store that night?

THE WITNESS: No.  It's the neighborhood store.

THE COURT: No further questions. Redirect.

(Tr. 9/4/13, pp. 157-60).

Petitioner further argues that the judge's questioning of Detroit Police Officer David

Andrews with respect to the caliber and make of the shell casings exhibited bias:

9

THE COURT: Officer Andrews, can you just return to your seat, please? The spent shell casings that you and your partner found outside of 15500 East Warren, were they all of the same caliber?

THE WITNESS: No, they weren't.

THE COURT: Look at the jury and speak into the microphone.

THE WITNESS: No, the casings were not—they were of the same caliber. They were not of the same make. I'm sorry.

THE COURT: They were all of the same caliber, but not of the same make. And by "make," what are you talking about?

THE WITNESS: Manufacturer.

THE COURT: Okay. What was the caliber of the spent shell casing that you found?

THE WITNESS: If I can refer to my report.

THE COURT: Yes, you may.

THE WITNESS: The caliber was a .40 caliber shell casings.

THE COURT: Okay. Now, these were ammunition for a rifle or for a handgun.

THE WITNESS: For a handgun.

THE COURT: And generally speaking, there's two different types of handguns, right, a revolver and a semi-automatic?

THE WITNESS: That's correct.

THE COURT: And with a revolver you've got a cylinder and the bullets are put into the cylinder; is that right?

THE WITNESS: Yes.

THE COURT: Either five or six at a time?

THE WITNESS: Correct.

THE COURT: Okay. And when the handgun is fired that's a revolver, what

10

happens to the shell casing?

THE WITNESS: The shell casings remain in the cylinder.

THE COURT: Okay, if the person is firing an semi-automatic, what happens to the shell casings?

THE WITNESS: The shell casings are ejected usually from the right port.

THE COURT: Okay. The firing mechanism from a revolver as contrasted with a semi-automatic, do you still have to pull the trigger each time it fires?

THE WITNESS: Yes, you do.

THE COURT: It's not like a machine gun where you pull the trigger once and it continually rapid fires, right?

THE WITNESS: Correct, that would be an automatic weapon.

THE COURT: That's an automatic weapon. So with a semi-automatic, you have to continue to pull the trigger each and every time; is that right?

THE WITNESS: Yes, that's correct.

THE COURT: And the total number of spent shell casings you found outside of this automobile on East Warren was how many?

THE WITNESS: Ten.

THE COURT: Redirect?

(*Id.*, pp. 89-91).

Petitioner further claims that the judge improperly questioned Officer McEntire:

THE COURT: Officer McEntire, where approximately was the defendant arrested?

THE WITNESS: He was arrested on—if I could refer to my report.

THE COURT: Yes, yes.

THE WITNESS: He was arrested on East Warren approaching Balfour Street in the city of Detroit.

11

THE COURT: East Warren and Balfour?

THE WITNESS: Yes, sir.

THE COURT: And that would be approximately how far away from Nottingham and Warren?

THE WITNESS: Maybe a block or so. They're right in the general vicinity. He was, I want to say, maybe two and a half blocks from the store.

THE COURT: Okay. Redirect?

(*Id.*, p. 209).

Petitioner further claims that the judge exhibited bias through his questioning of the

officer in charge of the case, Nancy Foster.  Petitioner points to the following exchange:

THE COURT: Officer Foster, when you became involved in this incident, this investigation, you determined the significance of a house on Munich?

THE WITNESS: Yes.

THE COURT: What was the significance of that?

THE WITNESS: After getting the search—the court order approved to go through the defendant's phone, I read his text messages, and he was advising different people to go to that location.

THE COURT: All right. Did you ever seek out a search warrant for that address on Munich?

THE WITNESS: Yes.

THE COURT: And was a search conducted of that house or building?

THE WITNESS: I'm sorry, what street are we speaking of again?

THE COURT: On Munich, on Munich.

THE WITNESS: Yes. I'm sorry, I have to review my file because I know I did a search warrant on either—

THE COURT: Go ahead.

12

THE WITNESS: I apologize. No, there was no search warrant for the Munich address.

THE COURT: And is there some reason why you never sought a search warrant for that Munich address?

THE WITNESS: There was no reason. I actually got a search warrant for the other location.

THE COURT: What other location?

THE WITNESS: The Chadsworth location. That would be his location that he hung out.

THE COURT: Well, didn't you have some information as to this address on Munich as being somewhat significant?

THE WITNESS: Yes.

THE COURT: What was the significance of it?

THE WITNESS: That he said he was staying there. Well, he was there from 6 o'clock P.M. to 1 o'clock A.M.

THE COURT: Well, wouldn't that be important then?

THE WITNESS: Well, not me because I didn't believe that he was actually there during the investigation.

THE COURT: Well, subsequently you came to find out that the defendant had filed an alibi witness notice; isn't that true?

THE WITNESS: Yes, that was just recent.

THE COURT: Okay, have you made any efforts to try to seek out a search warrant for that Munich address?

THE WITNESS: No, I didn't.

THE COURT: Redirect.

(Tr. 9/5/13, pp. 61-64).

Petitioner further complains about the following questions that the judge asked ATF

13

special agent Stan Brue:

THE COURT: And tell us what the parameters of that area would be.

THE WITNESS: Again, each of the cell sectors would be different. The general --

THE COURT: So were talking about this particular case. So tell us the area that it would potentially or conceivably be in.

THE WITNESS: It would be in the area of the homicide.

THE COURT: What does that mean?

THE WITNESS: That means that the cell sector that services the area of the homicide, that also services Munich, would be the outer boundaries of that coverage area would be roughly 1.2 miles from the cell tower.

THE COURT: All right. Can you tell us as to whether or not at the time of this homicide the telephone was east of Alter or west of Alter?

THE WITNESS: It was west of Alter. It would be – I'd have to look at that map again, but certainly Alter Road being the border. West of Alter means it was in Detroit, so it would be -- oh, I'm sorry, it would be -- no, sir, because that cell sector covers both east and west of Alter.

THE COURT: Oh, okay. And west of Alter or east of Alter would be Grosse Pointe Park, wouldn't it?

THE WITNESS: Well, north of Mack it would still be Detroit.

THE COURT: East of Alter is Grosse Pointe Park; is that right?

THE WITNESS: North of Mack, east of Alter is still Detroit.

THE COURT: I didn't say that. I said east of Alter.

THE WITNESS: Correct.

THE COURT: Let's say south of Mack.

THE WITNESS: South of Mack, that's Grosse Pointe.

THE COURT: Oh, okay, all right.

14

THE WITNESS: North of Mack, that's Detroit.

THE COURT: Would it still be within that area you're talking about?

THE WITNESS: East of Alter and north of Mack, yes, sir.

THE COURT: It wouldn't be south of Mack though?

THE WITNESS: No, one of the sectors does service south of Mack.

THE COURT: That would be a different -- that would be a different sector then?

THE WITNESS: No, it would be the same sector, but it would be --that one sector does cover a little area south of Mack. The tower is south of Mack. But it services up into Detroit.

THE COURT: That's what my question is to you.

THE WITNESS: Yes.

THE COURT: At the time this incident occurred, based upon your expertise, tell us the parameters, the area in which this cellular telephone would have been. Give us an eastern border, a northern border, a western border and a southern border.

THE WITNESS: Absolutely. The western border would be Alter Road.

THE COURT: Look at the jury and tell them.

THE WITNESS: The western border would be Alter Road. The northern border would be Outer Drive, East Outer Drive. The eastern border, again, would be Outer Drive, and the northern order or, excuse me, the southern border would be Mack. So between Mack, Alter Road and then Outer Drive as it, you know, configures around the city, around that east side there.

THE COURT: Recross.

(*Id.*, pp. 41-44).

Petitioner finally claims that the judge asked the medical examiner inappropriate

questions after the parties concluded their questioning of him:

THE COURT: Dr. Gupta, you had a – the illustration of the body.

15

THE WITNESS: Yes.

THE COURT: That you were pointing out the various wounds to the jury. Could you tell on that illustration where the wounds originated, in other words, the entrance as opposed to the exit wounds.

THE WITNESS: Okay, I can go again with the body.

THE COURT: Why, sure.

THE WITNESS: The entrance wound which is discovered as one is on the right arm, which is marked as circle over here in the body diagram. The entrance wound second, which is discovered the left of the abdomen is entering over here which is marked as a circle and exit over the lower right abdomen which is marked as a cross.

THE COURT: Thank you. Based upon the position of the entrance wounds that you just pointed out, can you tell us as to where the shooter would have been at the time that these injuries were inflicted upon Mr. Mack.

THE WITNESS: I can.

THE COURT: All right, Look at the jury. And you say that bullets were recovered from Mr. Mack's body.

THE WITNESS: There was one bullet recovered from gunshot wound number 1.

THE COURT: Was it intact or was it fragmented.

THE WITNESS: It was a deformed jacketed bullet.

THE COURT: A deformed jacket bullet.

THE WITNESS: Yes.

THE COURT: And where was it recovered from on Mr. Mack's body?

THE WITNESS: From the left side of the chest.

THE COURT: From the left side of the chest. So you say that this wound is from wound number 1, entrance wound number 1?

THE WITNESS: Yes.

16

THE COURT: And the traverse or the traveling of that particular bullet after it entered the body would have been what?

THE WITNESS: Can you say it again, please?

THE COURT: After the bullet entered Mr. Mack's body, can you describe for us its travel, course of travel?

THE WITNESS: The bullet traveled from the right arm going to the right side of the chest, to the right lung, to the heart, and a deformed bullet was located onto the left side of the chest.

THE COURT: And so that bullet struck what organs in Mr. Mack's body?

THE WITNESS: It struck the right arm muscle and the right chest wall and went to the right low of the lungs and to the heart, and then the bullet was recovered on the left side of the chest.

THE COURT: Okay. Would Mr. Mack have been capable of recovering from any of those wounds?

THE WITNESS: Technically, yes, if the medical intervention was performed. But in this particular case, it proved to be a fatal wound.

THE COURT: And could you tell us as to what general physical condition Mr. Mack was in save for or had it not been or had he not been shot on that evening?

THE WITNESS: He was – we didn't find any disease process, so he was a healthy man.

THE COURT: Of what age?

THE WITNESS: The age is stated as 30 years old.

THE COURT: A 30 year old. And with a normal life expectancy you would think then?

THE WITNESS: Yes.

THE COURT: No further questions. Redirect?

(Tr. 9/4/13, pp. 57-60).

The Michigan Court of Appeals rejected all of petitioner's judicial misconduct claims,

17

on the ground that the judge's questions to the various witnesses did not exhibit any bias or prejudice but merely sought additional information or to clarify the witnesses' testimony. *People v. Simmons*, 2015 WL 302751, at * 4-7.

A trial judge may interject himself or herself "into the trial, speak to counsel, and question witnesses in order to clear up confusion regarding the evidence or aid in its orderly presentation." *United States v. Powers*, 500 F.3d 500, 511 (6th Cir. 2007). In the present case, the trial court judge interjected himself only to clarify the witnesses' testimony. It is not unconstitutional under the Due Process Clause for a state trial judge to seek clarification from witnesses at a criminal trial. *Brown v. Palmer*, 358 F. Supp. 2d at 657; *See also Wenglikowski v. Jones*, 306 F. Supp. 2d 688, 695 (E.D. Mich. 2004). "In fact, it is proper for a judge to question a witness when necessary either to elicit the truth or to clarify testimony." *Brown*, 358 F. Supp. 2d at 657. Because the trial court judge's questions were proper, petitioner is not entitled to habeas relief.

Petitioner further claims that the judge exhibited bias by asking some of the witnesses to look at the jury while testifying. Petitioner argues that the judge was communicating the importance of the witnesses' testimony to the jury. The Michigan Court of Appeals rejected this portion of petitioner's claim:

> Defendant next argues that the trial judge' instruction to several witnesses to look at the jury while he was questioning them, indicated that his questions were important. However, the trial judge's instruction to the witnesses served a far less dubious purpose: to ensure that the jurors heard the witnesses' answers and were able to observe the witnesses during questioning. The trial judge also instructed Officer Andrews to "[l]ook at the jury and speak into the microphone." The fact that the trial judge asked Officer Andrews to speak into the microphone illustrates that the trial judge sought to ensure that the jury could understand the witnesses. Thus, there is no indication that the trial judge instructed the witnesses to look at the jury whole (sic) answering his questions because of the trial judge's bias.

18

*People v. Simmons*,  2015 WL 302751, at * 8.

The judge's remarks did not exhibit bias or prejudice but were rather simply ordinary efforts at courtroom administration, namely, an attempt to assure that the jurors could hear the witnesses.

Finally, any prejudice from the judge's various comments and questions was also cured by the fact that the judge instructed the jury that his comments, rulings, and instructions were not evidence and further advised the jurors that if they believed that the judge had an opinion about how they should decide the case, that they should disregard that opinion and that they were the only judges of the facts. (Tr. 9/6/13, pp. 53-54). *See Todd v. Stegal,* 40 F. App'x. 25, 28 (6th Cir. 2002).  Petitioner is not entitled to relief on his first claim.

### B.  Claim # 2.  The prosecutorial misconduct claim.

Petitioner claims he was denied a fair trial because of prosecutorial misconduct. Petitioner claims that the prosecutor committed misconduct by questioning Officer McEntire about the fact that 26 packages of marijuana were recovered from petitioner at the time of his arrest and later cross-examined petitioner about whether he sold and used drugs.  Petitioner claims that the evidence was irrelevant and that any probative value that the evidence did have was substantially outweighed by the danger of unfair prejudice.

"Claims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004)(citing *Bowling v. Parker*, 344 F. 3d 487, 512 (6th Cir. 2003)).  A prosecutor's improper comments will be held to violate a criminal defendant's constitutional rights only if they "'so infected the trial with unfairness

19

as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)(quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). Prosecutorial misconduct will thus form the basis for habeas relief only if the conduct was so egregious as to render the entire trial fundamentally unfair based on the totality of the circumstances. *Donnelly v. DeChristoforo*, 416 U.S. at 643-45.  In order to obtain habeas relief on a prosecutorial misconduct claim, a habeas petitioner must show that the state court's rejection of his prosecutorial misconduct claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012)(quoting *Harrington*, 562 U.S. at 103).

Although petitioner has framed his claim as a prosecutorial-misconduct challenge, "it amounts in the end to a challenge to the trial court's decision to allow the introduction of this evidence." *Webb v. Mitchell*, 586 F. 3d 383, 397 (6th Cir. 2009).  "A prosecutor may rely in good faith on evidentiary rulings made by the state trial judge and make arguments in reliance on those rulings." *Cristini v. McKee*, 526 F.3d 888, 900 (6th Cir. 2008).  The Sixth Circuit has noted that there are no Supreme Court cases which support the proposition that a prosecutor's questions that simply call for answers that are inadmissible due to relevancy constitute prosecutorial misconduct that rises to the level of a federal due process violation. *See Wade v. White,* 120 F. App'x. 591, 594 (6th Cir. 2005).  Therefore, the fact that the prosecutor allegedly elicited irrelevant evidence throughout petitioner's trial would not entitle him to habeas relief. *Id.*

Moreover, the Michigan Court of Appeals determined that evidence concerning petitioner's possession and sales of marijuana was relevant to establish a motive for the

20

murder, because it established a connection between petitioner and the victim, who also sold drugs in the same neighborhood. *People v. Simmons*, 2015 WL 302751, at * 9–10.

Under Michigan law, proof of motive in a prosecution for murder, although not essential, is always relevant, and evidence of other acts to prove motive is admissible. *People v. Rice*, 235 Mich. App. 429, 440; 597 N. W. 2d 843 (1999).  The Sixth Circuit observed that "[t]he Supreme Court has never held (except perhaps within the capital sentencing context) that a state trial court's admission of *relevant* evidence, no matter how prejudicial, amounted to a violation of due process." *Blackmon v. Booker*, 696 F. 3d 536, 551 (6th Cir. 2012)(emphasis original).  Petitioner is not entitled to relief on his second claim.

### C.  Claim # 3.  The ineffective assistance of counsel claim.

Petitioner finally claims that trial counsel was ineffective for failing to object to the judicial and prosecutorial misconduct that he alleged in Claims # 1 and # 2.

To show that he was denied the effective assistance of counsel under federal constitutional standards, a defendant must satisfy a two prong test.  First, the defendant must demonstrate that, considering all of the circumstances, counsel's performance was so deficient that the attorney was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  In so doing, the defendant must overcome a strong presumption that counsel's behavior lies within the wide range of reasonable professional assistance. *Id.* In other words, petitioner must overcome the presumption that, under the circumstances, the challenged action might be sound trial strategy. *Strickland,* 466 U.S. at 689.  Second, the defendant must show that such performance prejudiced his defense. *Id.*  To demonstrate prejudice, the defendant

21

must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. "*Strickland*'s test for prejudice is a demanding one. 'The likelihood of a different result must be substantial, not just conceivable.'" *Storey v. Vasbinder*, 657 F.3d 372, 379 (6th Cir. 2011)(quoting *Harrington*, 562 U.S. at 112). The Supreme Court's holding in *Strickland* places the burden on the defendant who raises a claim of ineffective assistance of counsel, and not the state, to show a reasonable probability that the result of the proceeding would have been different, but for counsel's allegedly deficient performance. *See Wong v. Belmontes*, 558 U.S. 15, 27 (2009).

Petitioner first contends that trial counsel was ineffective for failing to object to the judge's alleged misconduct in this case. The judge's questions to the witnesses to clarify their testimony were proper; counsel was not ineffective for failing to object to the questions. *See U.S. ex rel. Rockman v. DeRobertis,* 717 F. Supp. 553, 554 (N.D. Ill. 1989).

Petitioner next contends that trial counsel was ineffective for failing to object to the prosecutor eliciting testimony concerning petitioner's possession and sale of marijuana. The Michigan Court of Appeals rejected petitioner's ineffective assistance of counsel claim on the ground that such evidence was relevant and admissible. *People v. Simmons*, 2015 WL 302751, at * 11.

Federal habeas courts "'must defer to a state court's interpretation of its own rules of evidence and procedure' when assessing a habeas petition." *Miskel v. Karnes*, 397 F.3d 446, 453 (6th Cir. 2005)(*quoting Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988)). Because the Michigan Court of Appeals determined that this evidence was admissible

under Michigan law, this Court must defer to that determination in resolving petitioner's ineffective assistance of counsel claim. *See Brooks v. Anderson*, 292 F. App'x. 431, 437-38 (6th Cir. 2008). The failure to object to relevant and admissible evidence in not ineffective assistance of counsel. *See Alder v. Burt,* 240 F. Supp. 2d 651, 673 (E.D. Mich. 2003). Petitioner is not entitled to his relief on his third claim.

## IV.  Conclusion

The Court will deny the petition for writ of habeas corpus with prejudice. The Court will also deny a certificate of appealability to petitioner. In order to obtain a certificate of appealability, a prisoner must make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). To demonstrate this denial, the applicant is required to show that reasonable jurists could debate whether, or agree that, the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rules Governing § 2254 Cases, Rule 11(a), 28 U.S.C. foll. § 2254; *See also Strayhorn v. Booker,* 718 F. Supp. 2d 846, 875 (E.D. Mich. 2010).

For the reasons stated in this opinion, the Court will deny petitioner a certificate of appealability because he has failed to make a substantial showing of the denial of a federal constitutional right. *See Allen v. Stovall,* 156 F. Supp. 2d 791, 798 (E.D. Mich. 2001). The Court will also deny petitioner leave to appeal *in forma pauperis*, because the appeal would be frivolous. *Id.*

## V. <u>ORDER</u>

Based upon the foregoing, IT IS ORDERED that the petition for a writ of habeas corpus is **DENIED WITH PREJUDICE.**

IT IS FURTHER ORDERED That a certificate of appealability is **DENIED.**

IT IS FURTHER ORDERED that Petitioner will be **DENIED** leave to appeal *in forma pauperis.*

s/ Nancy G. Edmunds
**HON. NANCY G. EDMUNDS**
UNITED STATES DISTRICT COURT JUDGE

Dated: October 18, 2016

24